UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DERRICK HILLMAN**, and | ) | Case No. 5:09 CV 2538 |
| **DALLAS HILLMAN**, | ) | |
| | ) | |
| Petitioners, | ) | Judge Kathleen M. O'Malley |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| **MARGARET BEIGHTLER**, | ) | (Regarding ECF #1, 6) |
| | ) | |
| Respondent. | ) | Magistrate Judge James S. Gallas |
| | ) | |

        Petitioners Derrick Hillman and Dallas Hillman (hereinafter "Hillmans") are  prisoners in

state custody who seek habeas corpus relief pursuant to 28 U.S.C. §2254  from their October 26,

2006 convictions in the Wayne County, Ohio Court of Common Pleas on charges of possession of

crack cocaine and illegal conveyance of crack cocaine onto the grounds of a detention facility (the

Wayne County Justice Center).  In January 2007 the state trial court sentenced Derrick Hillman to

concurrent five year sentences. Dallas Hillman was sentenced concurrently to eight years.

(Respondent's Ex. 5-7). Both Hillmans  entered no-contest pleas following the trial court's denial

of their motion to suppress. Their convictions and sentences were followed by appeals challenging

the constitutionality of the trial court's rulings  under the Fourth Amendment to permit the State to

introduce evidence of the crack cocaine seized from their persons. See *State v. Hillman*, 2008 WL

2582664, 2008-Ohio-3204 ( Ohio 9 Dist. June 30, 2008), *appeal not allowed*, 119 Ohio St. 3d 1505,

895 N.E.2d 567, 2008-Ohio-5467 (Table 2008), *cert. denied*, *sub nom. Hillman v. Ohio*, -U.S.-, 129

S.Ct. 1630, 173 L.Ed.2d 997 (2009).

2

The Hillmans have exhausted their state remedies for purposes of 28 U.S.C. §2254(b), and now appear in Federal District Court seeking collateral review of their convictions on the following two grounds:

> **GROUND ONE**: The appellant's Derrick Hillman's and Dallas Hillman's rights to be free from unreasonable searches and seizures under the United States Constitution were violated when the trial court erroneously denied the Hillmans' motion to suppress unlawfully obtained evidence.

> **GROUND TWO**: Where the validity of a search rests on consent, the prosecution must show any consent said to have been given survived any effort to withdraw such alleged consent.

> ( Petition, ECF # 1, and Memorandum in Support ECF # 3).

*I. General Lack of Cognizability of 4th Amendment Claims:*

The Hillmans rely on the well-established rule that incriminating physical evidence illegally seized contrary to the Fourth Amendment must be excluded under the "fruits of the poisonous tree doctrine." See *United States v. Hill,* 195 F.3d 258, 264 (6th Cir.1999)(quoting *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). However, the scope of review of alleged Fourth Amendment violations in federal habeas corpus proceedings is extremely narrow, and "where the State has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)(footnotes omitted). "Full and fair" litigation opportunity in the state courts is determined with two distinct inquiries: (1) whether the State has provided a procedural mechanism through which, in the abstract, petitioner could raise a Fourth Amendment claim; and (2) whether petitioner's presentation of the claim was in fact frustrated

3

because of a failure of that mechanism. See *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001)(citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982), *cert. denied*, 459 U.S. 948 (1982)).

The Ohio procedural mechanism is adequate in the abstract to review Fourth Amendment claims.  See *Riley v. Gray*, 674 F.2d at 526. Accordingly, the focus of this inquiry shifts to whether presentation of the Fourth Amendment argument was frustrated because of a failure in the procedural mechanism to allow for the opportunity for "full and fair" litigation of the Fourth Amendment suppression claim.  See *Riley v. Gray*, 674 F.2d at 526; *Machacek v. Hofbauer*, 213 F.3d at 952.  Essentially, the Hillmans simply disagree with the unfavorable analysis and outcome in the state courts and they do not demonstrate actual frustration of the suppression proceeding. They, however,  contend that Federal collateral review in no longer limited to the two-prong test from *Stone v. Powell* for assessing a denial of a "full and fair" opportunity to litigate their Fourth Amendment claims

*II. Circumvention of the Bar against Review of 4th Amendment Claims:*

In their traverse the Hillmans attempt to circumvent the bar against Federal collateral review under *Stone v. Powell*, arguing two theories.  First, the Hillmans claim that review is  provided under 28 U.S.C. §2254(d)(2) as a claim adjudicated in state court under "an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."  Second, they maintain that the state court adjudications were a denial of fundamental fairness. Thus, they request that the

4

court apply the denial of fundamental fairness exception for collateral review of nonconstitutional claims - apparently without awareness that this argument was also addressed in *Stone v. Powell*. [1]

## A. §2254(d) does not Circumvent or Override Stone v. Powell:

First, there is no basis for the underlying argument that Congress has overridden *Stone v. Powell* in §2254(d)(2). Fourth Amendment claims lie in a realm outside §2254. As the Supreme Court explained in *Stone,* the Fourth Amendment exclusionary rule is contrary to the "truthfinding process." *Id.*, 428 U.S. at 490-91. " Post-*Mapp* Decisions have established that the rule is not a personal constitutional right. It is not calculated to redress the injury to the privacy of the victim of the search or seizure, for any '(r)eparation comes too late.'" *Id.*, 428 U.S. at 486 (quoting *Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965)). In contrast, the essence of habeas corpus under §2254(a) is an attack by a person in custody upon the "legality of that custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). The majority opinion in *Stone* did not clearly illuminate this segregation of Fourth Amendment claims from the general body of constitutional claims based on the Fifth, Sixth, Eighth and Fourteenth Amendments. However, dissenting Justice Brennan astutely highlighted that the principle set out

---

[1] In note 10 of the decision in *Stone v. Powell*, the Supreme Court elaborated on several points of collateral review including that:

> Even those nonconstitutional claims that could not have been asserted on direct appeal can be raised on collateral review only if the alleged error constituted " 'a fundamental defect which inherently results in a complete miscarriage of justice,' " id., at 346, 94 S.Ct. at 2305, quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962).

*Stone*, 428 U.S. at 477 n. 10.

5

in *Stone* by the majority is that the exclusionary rule stands apart from the lawfulness of custody.

[2]  Fourth Amendment violations, in general, do not contribute to the petitioner's custody. See *Hampton v. Wyant,* 296 F.3d 560, 562 -563 (7ᵗʰ Cir. 2002); [3] *Cabrera v. Hinsley,* 324 F.3d 527, 530 (7ᵗʰ 2003)(quoting *Hampton v. Wyant,* 296 F.3d at 563); *Crater v. Galaza,* 508 F.3d 1261, 1269 (9ᵗʰ Cir. 2007)(dissenting opinion).[4]  Federal appellate decisions which have addressed this issue  have cited  both rationales from *Stone,* that this type of constitutional violation is excepted both because

---

[2]  Justice Brennan dissented stating:

I can only presume that the Court intends to be understood to hold either that respondents are not, as a matter of statutory  construction, "in custody in violation of the Constitution or laws . . . of the United States," or that " 'considerations of comity and concern for the orderly administration of criminal justice,' " Ante, at 3044 n. 11, are sufficient  to allow this Court to rewrite jurisdictional statutes enacted by Congress. Neither ground of decision is tenable; the former is simply illogical, and the latter is an arrogation of power committed solely to the Congress (footnote omitted).

*Stone*, 428 U.S. at 504-506, 96 S.Ct. at 3057- 3058 (Brennan J.dissenting).

[3]   As the Seventh Circuit explained:

Put otherwise, a person imprisoned following a trial that relies, in part, on unlawfully seized evidence is not "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The seizure may have violated the Constitution, but the custody does not, because the exclusionary rule is a social device for deterring official wrongdoing, not a personal right of defendants. See also *Reed v. Farley*, 512 U.S. 339, 347-48, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994) (emphasizing that *Stone* recognizes limitations on use of the exclusionary remedy) (plurality opinion).

*Hampton v. Wyant,*  296 F.3d 560, 562 -563 (7ᵗʰ Cir. 2002).

[4]    While the undersigned does not agree with this dissenting opinion's view of §2254(d), as amended by the AEDPA as an unconstitutional usurpation of judicial power, this opinion bolstered its position with recognition of the unique treatment accorded Fourth Amendment claims as outside the scope of § 2254. As explained by the dissenting decision in *Crater* to denial of rehearing *en banc*,

Where a petitioner asserts the violation of a constitutional right-indeed, even one so fundamental as the right to be free from unreasonable searches and seizures-but the violation did not contribute to the custody of the petitioner, the Court has held that such a claim is not cognizable on habeas. See *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (holding that Fourth Amendment claims are not cognizable on habeas review because the Fourth Amendment exclusionary rule does not relate to the accuracy of the fact-finding process).

*Crater v. Galaza,* 508 F.3d at1269.

6

it is separate from the fact-finding process, and because it is distinct from the "personal rights" of criminal defendants. *See Brock v. United States,* 573 F.3d 497, 501 (7th Cir. 2009); *Crater v. Galaza*, 508 F.3d at 1269; *Hampton v. Wyant,* 296 F.3d at 562 -563.  Under either reason for the segregation of Fourth Amendment claims,  "[t]he AEDPA's changes to § 2254(d) apply only to cases within the scope of § 2254(a) . . .  and *Stone* is based on an interpretation of § 2254(a) that treats inaccurate administration of the exclusionary rule as outside the scope of that statute." *Cabrera v. Hinsley,* 324 F.3d 527, 530 (7th 2003)(quoting *Hampton v. Wyant*, 296 F.3d at 563); accord *Crater v. Galaza*, 508 F.3d at 1269.


Further, the statutory history controverts the Hillmans' contention.  Prior to the current version of  "unreasonable determination of the facts" under §2254(d)(2), its forerunner provided in 28 U.S.C. §2254(d)(8)(notably at the time *Stone v. Powell* was decided), for Federal judicial review over whether factual determinations were "fairly supported by the record."  Obviously, at the time *Stone v. Powell* was decided, the Supreme Court had been aware of the Federal judicial power to review the state courts' factual conclusions, yet constrained this power in the formulation of the two-prong test. When Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA) it merely rephrased the existing law governing review of factual determinations from fair-support to unreasonable-determinations,  and did not legislatively overturn *Stone* with the inclusion of the "unreasonable determination" verbiage in §2254(d)(2).

7

*B.  "Denial of Fundamental Fairness" is not "Clearly Established Federal Law":*

The Hillmans arguments also seek to break new ground with their denial of fundamental fairness contention, but this argument was addressed nearly 30 years ago in *Riley*'s definition of the "opportunity for full and fair litigation." See *Riley*, 674 F.2d at 525-27. Two competing interpretations of *Stone* were argued to the Sixth Circuit, which decided to take a more moderate approach. *Riley* rejected the 10th Circuit's approach from *Gamble v. State of Oklahoma*, 583 F.2d 1161 (10th Cir. 1978), that judicial review of "full and fair litigation" demanded both the procedural opportunity to present the Fourth Amendment claim **and** "at least colorable application of the correct fourth amendment constitutional standards" *Riley*, 674 F.2d at 525 (citing *Gamble*, 583 F.2d at 1165). *Gamble*'s analysis was rejected in part because it entailed "case by case review is inconsistent with *Stone*'s assumption that state courts are as capable of deciding fourth amendment issues as federal courts."  *Riley*, 674 F.2d at 526.  However, *Riley* preserved that part of *Gamble*, which assigned the district court the responsibility for "egregious error" review of Fourth Amendment claims for "[w]hen a petitioner alleges egregious error in the application of fourth amendment principles of a magnitude and nature similar to the state court error present in Gamble." *Id*. [5]

This further leads to the next crucial point which the Hillmans have failed to recognize- the structural limit of §2254(d) to "clearly established Federal law."  Since the enactment of the AEDPA, the phrase "clearly established Federal law" refers to holdings, as opposed to *dicta,* of the

---

[5]  Accordingly, the Sixth Circuit's position is categorized in 75 A.L.R. Fed 9, as falling within the "View that state court's willful refusal to apply correct Fourth Amendment standard constitutes denial of opportunity for full and fair litigation is state court." See 75 A.L.R. Fed 9 §4.

8

U.S. Supreme Court at the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Bell v. Cone*, 535 U.S. 685, 698, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914(2002). "[I]t is not  'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance.* -U.S.-,129 S.Ct.1411,1419, 173 L.Ed.2d 251 (2009)(quoting *Wright v. Van Patten*, 552 U.S. 120, 128 S.Ct., 743,746-47, 169 L.Ed.2d 583 (2008) (*per curiam*); *Schriro v. Landrigan*, 550 U.S. 465, 478, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *Carey v. Musladin*, 549 U.S. 70, 76-77, 127 S.Ct. 649, 654, 166 L.Ed.2d 482 (2006).  The state court was not required to apply the Sixth Circuit's interpretative expansion of *Stone v. Powell* in *Riley v. Gray,* and because the Federal district court on collateral review under §2254(d) does not review for error beyond "clearly established Federal law," this court cannot engage in review over whether the state court's decision contained error for denial of "fundamental fairness."

As Justice Stevens had in his life observed, there are four categories of Constitutional error. See *Rose v. Lundy*, 455 U.S. 509, 543-544, 102 S.Ct. 1198, 1216 - 1217, 71 L.Ed.2d 379 (Stevens J. dissenting,1982). [6] The third type- Fourth Amendment claims- "do not reveal the kind of

---

[6] "The one most frequently encountered is a claim that attaches a constitutional label to a set of facts that does not disclose a violation of any constitutional right. In my opinion, each of the four claims asserted in this case falls in that category. The second class includes constitutional violations that are not of sufficient import in a particular case to justify reversal even on direct appeal, when the evidence is still fresh and a fair retrial could be promptly conducted. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705; *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284. A third category includes errors that are important enough to require reversal on direct appeal but do not reveal the kind of fundamental unfairness to the accused that will support a collateral attack on a final judgment. See, e.g., *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067. The fourth category

9

fundamental unfairness to the accused that will support a collateral attack on a final judgment." *Id*. The holding from *Stone v. Powell* was not as succinctly put, but the point was clear that "[a] claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights[.]" *Stone*, 428 U.S. at 490, 96 S.Ct. at 3050 (quoting *Kaufman v. United States*, 394 U.S. 217, 237, 89 S.Ct. 1068, 1079, 22 L.Ed.2d 227 (1969)).  The U.S. Supreme Court has not expanded its two-prong test on collateral review for "full and fair" opportunity to litigate to include review beyond failure of the state mechanism into the more nebulous consideration of "fundamental fairness."

## IV.  There was no "Egregious Error" for a denial of Fundamental Fairness:

That being said, the Hillmans argument that the result of the state court decision was manifestly unjust fails to rise to the level of a denial of fundamental fairness. The undersigned believes for the reasons advanced above that under the AEDPA a discussion of fundamental unfairness is unnecessary, but with an abundance of caution will address the Hillmans' denial of fundamental fairness claim, however, applying the reasoning and standard from *Riley* of "egregious error."

---

includes those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained. This category cannot be defined precisely; concepts of "fundamental fairness" are not frozen in time. But the kind of error that falls in this category is best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus-that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of perjured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods. Errors of this kind justify collateral relief no matter how long a judgment may have been final and even though they may not have been preserved properly in the original trial.(footnotes omitted)."

*Rose v. Lundy,* 455 U.S. 509, 543-544, 102 S.Ct. 1198, 1216 - 1217, 71 L.Ed.2d 379 (Stevens J. dissenting,1982)

10

*A.  Underlying Facts and Law as set forth in the State Decision:*

Analysis of the question of egregious error  begins with  review of the facts before the state

courts. "On habeas review, the state court of appeals's findings of fact must be presumed correct,

and can only be discredited if the petitioner can show, by clear and convincing evidence, that the

state court's findings were erroneous. 28 U.S.C. § 2254(e)(1)." *Mitzel v. Tate,* 267 F.3d 524, 537

(6th Cir. 2001). The state appellate court's factual findings and legal conclusion were as follows:

> {¶ 1} On November 15, 2004, Senior Agent Charles Ellis of the Medway Drug
> Enforcement Agency ("Medway") received information from a confidential informant
> that Dallas Hillman and another black male would be arriving in Wooster around 1:00
> p.m. that day driving a black Lincoln Navigator. According to the informant, the two men
> would be transporting crack cocaine from Cleveland to sell in Wooster. The informant
> gave Agent Ellis an address of a residence where the two men were going to be dropping
> off the drugs. Agent Ellis recognized the address as the residence of Michael Hall. Agent
> Ellis knew that Hall had previously been convicted of drug trafficking. Based on his past
> experience with this informant and the fact that Medway had worked successfully with
> this particular informant on multiple occasions in recovering contraband, Agent Ellis
> considered him to be reliable.

> {¶ 2} Agent Ellis contacted the Wooster Police Department for assistance. Wooster
> Police put the residence under surveillance. Around 1:00 p.m., the informant contacted
> Agent Ellis to let him know that the two men would be arriving approximately one-half
> hour to one hour late. Around the time the two men were to arrive, Wooster Police
> observed a black Lincoln Navigator with two black males inside approaching Wooster.
> The police ran the plate, and the registration belonged to a resident of Cleveland. The
> police followed the vehicle to Hall's residence and pulled it over. Derrick Hillman was
> driving the vehicle and Dallas Hillman was in the passenger seat. The police explained to
> the men that they had received a tip that they were transporting drugs into the area for
> sale. The two men complied with the officer's request that they exit the vehicle. Upon
> exiting the vehicle, the Hillmans were searched. When asked, the two men stated that
> there were no drugs in the vehicle.

> {¶ 3} Agent Ellis asked Derrick Hillman for consent to search the vehicle for drugs;
> Derrick consented to the search. Derrick and Dallas were questioned separately regarding
> their reason for being in the area and they gave conflicting stories about why they were
> there-one said it was to go shopping and the other answered that they were there to meet
> a guy to build something.

11

{¶ 4} During the initial consent search of the vehicle, Officer Brian Waddell, a member of the City of Wooster's canine unit, was contacted to bring his drug dog to search the vehicle. No drugs were found in the vehicle by the officers, but the dog became more aggressive walking around the outside of the vehicle and alerted on an inside panel of the vehicle. Officer Waddell indicated that because the dog did not have a strong reaction, the drugs may not be in the car but they were probably with the passengers. Because of the dog's alert on the vehicle, the police searched it again.

{¶ 5} During the second search of the vehicle, approximately 15 to 30 minutes after the initial stop, Agent Ellis spoke with the confidential informant who had paged him. The informant told Agent Ellis that if the drugs were not in the vehicle, the two men usually kept the packages taped to their testicles.

{¶ 6} At some point during these events, Michael Hall approached one of the police cruisers to speak with Dallas. Agent Ellis testified that the police knew Hall to be involved in drug trafficking in the area. According to the confidential informant, Hall's residence was the Hillmans' destination with the drugs.

{¶ 7} Based upon the information from the informant, the conflicting stories from Dallas and Derrick, the drug dog alert on the vehicle, and Hall asking to speak with Dallas, Agent Ellis asked the Hillmans to go to the Wayne County Justice Center for a strip search; they agreed to go.

{¶ 8} When they arrived at the Justice Center, the Hillmans initially stated that they would not consent to a strip search and said they would fight the officers. The Hillmans finally agreed to the strip search and Dallas was searched first. After Dallas removed his clothes, Agent Ellis looked over Dallas. Agent Ellis asked him to squat down and he replied that he had a problem with his genitals. Agent Ellis then saw a clear plastic baggie sticking out from under Dallas' testicles. Agent Ellis asked Dallas to give him the baggie. Dallas attempted to get away and Agent Ellis reached down and grabbed the baggie.

{¶ 9} Derrick was then brought into the interview room to be searched. Upon seeing the bag of crack on the table, Derrick removed his clothes and the officers recovered two bags of crack, one small bag and a larger bag hidden under his testicles. The Hillmans were then placed under arrest for possession of drugs and conveyance of drugs onto the grounds of a detention facility.

{¶ 10} From the time of the initial stop until the drugs were seized, approximately one hour and twelve minutes elapsed.

* * * *

{¶ 16} A police officer may make an investigative stop of an individual if he reasonably suspects that the individual is involved in criminal activity. *Terry v. Ohio* (1968), 392

12

U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889. This standard also applies to investigatory stops of automobiles. *United States v. BrignoniPonce* (1975), 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607; *United States v. Cortez* (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621. "Where, as here, the information possessed by the police before the stop stems solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip." *Maumee v. Weisner* (1999), 87 Ohio St.3d 295, 299, 720 N.E.2d 507. The question before us is whether the tip itself had sufficient indicia of reliability to justify the investigative stop. We consider several factors " 'highly relevant in determining the value of [the informant's] report' " including "the informant's veracity, reliability, and basis of knowledge." Id. (quoting *Illinois v. Gates* (1983), 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527).


{¶ 17} Agent Ellis testified at the suppression hearing. Agent Ellis testified that although he had only worked with this particular informant on one other occasion, Medway had worked with him numerous times. Agent Ellis stated that on the previous occasions, the information provided by the informant had led to the recovery of contraband such as drugs. In this case, the confidential informant identified the type of vehicle, the time the vehicle would arrive, the destination of the vehicle, the number of occupants, the identity of one of the occupants, and the location of the drugs. After reviewing Agent Ellis' testimony, this Court finds that the tip Agent Ellis received had sufficient indicia of reliability to justify the investigative stop.


**Continued Detention Was Proper**

{¶ 18} The Hillmans next argue that, assuming the tip from the confidential informant had sufficient indicia of reliability to justify the stop, their continued detention after the initial search of their persons and of the vehicle revealed no evidence of criminal activity was improper. This Court disagrees.


{¶ 19} This Court first notes that the Hillmans voluntarily exited their vehicle and Derrick consented to the initial search the vehicle. During the initial search of the vehicle, the reasonableness of which is not challenged, Officer Brian Waddell, a member of the City of Wooster's canine unit, was called to bring his drug dog to the scene to perform a routine drug sniff of the vehicle.


{¶ 20} During the drug sniff, Officer Waddell's dog alerted to the vehicle. Officer Waddell informed Agent Ellis that he did not have a strong alert which indicated that the drugs were probably on the Hillmans. The vehicle was searched again after the dog alerted to it, but no drugs were found. The Hillmans complain that the drug dog sniff and subsequent search unreasonably prolonged their initial lawful detention. They point to *Blue Ash v. Kavanagh*, 113 Ohio St.3d 67, 862 N.E.2d 810, 2007-Ohio-1103, to support their position. In Kavanagh, the Ohio Supreme Court considered the delay caused by a drug dog sniff and concluded that it would be possible for the delay to unreasonably extend the search. *Id*. at ¶ 22. *Kavanagh* is distinguishable from this case, however,

13

because of the nature of the initial stop. The stop at issue in Kavanagh arose from a traffic law violation. Id. at ¶ 29, 862 N.E.2d 810. The stop here arose from an informant's tip. A driver stopped for a traffic law violation may usually leave after the purpose for the stop ends because there exists an end to a traffic stop-issuing a citation or warning. Id. citing *State v. Robinette* (1997), 80 Ohio St.3d 234, 685 N.E.2d 762.

{¶ 21} The drug dog sniff of Hillman's vehicle did not unreasonably extend the stop. Instead, it provided additional information to the officers as they continued to act on the informant's tip. We note that the Hillmans concede in their brief that the drug dog's "positive alert would have given the officers reason to extend the duration of the search and to carry out a second search of the vehicle." They contend that we should not reach that point because the drug dog search unreasonably delayed the detention. Having reached the opposite conclusion, we agree with the Hillmans' concession.

{¶ 22} Additional information came to the officers as the search continued. After the drug dog alerted on the vehicle, the informant paged Agent Ellis. Agent Ellis learned from the informant that if no drugs were found in the vehicle, the Hillmans sometimes kept the drugs taped to their genitals. The officers now had additional pieces of information that changed the landscape-the additional information from the informant, the drug dog's alert, and the visit by a known drug dealer to the scene of the search.

{¶ 23} After no drugs were found in the vehicle following the second search, the decision was made to strip search the Hillmans. The site of the traffic stop was not an appropriate location to perform a strip search, so Agent Ellis asked the Hillmans to accompany him to the Wayne County Justice Center. The Hillmans agreed to go to the Justice Center so that the police could conduct a strip search of their persons for drugs. Having given their consent, they should not be heard now to complain that this unreasonably extended their detention.

{¶ 24} When they arrived at the Justice Center, the Hillmans initially reversed course and stated that they would not consent to a strip search. They then agreed to the strip search and Dallas was searched first. Agent Ellis first performed a plain look search and then asked Hillman to bend down and squat. Hillman stated that he had a problem with his genitals. At that point, Agent Ellis saw a clear plastic baggie sticking out from under his testicles. Agent Ellis asked Hillman to hand him the baggie at which point Hillman turned and tried to get away. Agent Ellis reached down and grabbed the baggie.

{¶ 25} Derrick was then brought into the room. Upon seeing the baggie of crack, he removed his clothes. One baggie fell as he disrobed and he removed another bag from his testicles. After the strip search was conducted and the drugs recovered, the Hillmans were placed under arrest.

{¶ 26} The drug dog sniff and strip search did not unreasonably extend the Hillman's detention.

14

**De Facto Arrest**

{¶ 27} The Hillmans argue their continued detention after multiple searches of their persons and of their vehicle resulted in no contraband being found and their transportation to the Justice Center for a strip search without their consent constituted a de facto arrest.

{¶ 28} "Whether a suspect is in custody depends on the facts and circumstances of each case." *State v. Dunn*, 9th Dist. No. 04CA008549, 2005-Ohio-1270, at ¶ 24, citing *State v. Warrell* (1987), 41 Ohio App.3d 286, 287, 534 N.E.2d 1237. The test is "whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497.

{¶ 29} Viewing the totality of the circumstances in the present matter, this Court finds that the trial court did not err in finding that the Hillmans' continued detention did not result in their being placed in custody. A review of the record shows that Derrick consented to the initial search of the vehicle. There was no indication that there was a significant delay between the initial search of the vehicle and the drug dog sniff. The drug dog sniff of the vehicle indicated the presence of drugs in the vehicle. When no drugs were found in the vehicle after a second search, a strip search was appropriate. The strip search could not be performed at the location of the traffic stop, so it was necessary to transport the Hillmans to the Justice Center, and the Hillmans voluntarily went to the Justice Center.FN1 Furthermore, although initially the Hillmans said they would not consent to the strip search, they later consented. Therefore, their argument that the police should have obtained a search warrant before performing the strip search is without merit. In light of their consent, no search warrant was needed. During the strip searches, crack cocaine was found on the persons of both Dallas and Derrick Hillman. At that point, they were placed under arrest.

FN1. In their brief, the Hillmans characterize their transportation to the Justice Center as the "involuntary." However, the only evidence presented at the suppression hearing was Agent Ellis' testimony.

*State v. Hillman*, 2008 WL 2582664, at *1-5.

*B. Denial of Suppression did not arise from "Egregious Circumstances":*

Before commencing this analysis, the undersigned points out that this review over the question whether "egregious circumstances" were present,  quickly crosses into the territory of

15

the criteria  of  Fourth Amendment claims on direct review.  Circuit case law appears to have

unintentionally opened the door into a mixture of direct and collateral review concepts.  This

simply adds support for the initial analysis in this report and recommendation  that *Stone v.*

*Powell* continues to apply on collateral review, and that the Hillmans' contention for review to

be conducted under the "unreasonable determination of the facts" standard from §2254(d)(2) will

erode the purpose of the U. S. Supreme Court's decision in *Stone v. Powell*.

"A lawful *Terry* stop requires that the authorities be able to point to 'specific and

articulable facts' justifying their reasonable suspicion that the suspect has been or is about to be

involved in criminal activity." *United States v. Garza*,  10 F.3d 1241, 1245 (6th

Cir.1993)(quoting *United States v. Sokolow*, 490 U.S. 1, 12, 109 S.Ct. 1581, 1588, 104 L.Ed.2d 1

(1989); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). The state

appellate court analyzed the correct factors for the initial stop of the officer's reasonableness of

suspicion and further, the reliability of the confidential informant in determining whether a *Terry*

investigative stop of the vehicle was justified. See *Adams v. Williams*, 407 U.S. 143, 146-47, 92

S.Ct. 1921, 32 L.E.2d 612 (1972)(upholding *Terry* stop where officer investigated and verified

information from a known informant); *United States v. Williams*, 224 F.3d 530, 532-33 (6th Cir.

2000)(informant whose information led to prior arrests and convictions was sufficiently reliable).

The Hillmans, though do not focus on the reason for the stop.  Rather, their contentions

focus on the extent of time they were held, but not under arrest.  The state trial  and  appellate

courts found the extended detention for slightly over an hour to be reasonable, with the trial

16

court citing *United States v. Sharpe*, 470 U.S. 675 (1985). See (Respondent's Ex. 12, ECF # 6-1) However, the Hillmans argue that the prolonged and continued detention constituted a second seizure which amounted to an arrest without probable cause.

The state court decisions adhered to the principle that  "there is no "rigid time limitation on *Terry* stops." *United States v. Garza,*10 F. 3d 1241, 1246 (6th Cir. 1993)(quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed. 2d 605 (1985)). "[T]he Supreme Court has emphasized  'the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.*  If the authorities are pursuing a legitimate course of investigation diligently, the courts "should not indulge in unrealistic second-guessing," so there is no Fourth Amendment violation. See *Sharpe*, 470 U.S. at 686; *Garza,* 10 F.3d at 1246; *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). The state courts acknowledged that the detention was extended but found it justified and supported by the drug sniffing dog's "positive alert" (See ¶ 21), and the response from the informant that the drugs may be taped to the Hillman's genitals (See  ¶ 22).   Thus, the state court found further detention was constitutional because "something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir.1999)(quoting *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998)( *en banc*), *cert. denied,*525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995)).

17

The Hillmans argue that the informant's response came much later in time and they meanwhile were seated and handcuffed for an hour in a police car.   An hour long detention would on direct review present a legally debatable point over the reasonableness of such action. Although the Supreme Court has adopted no bright line rule it has held it has " never approved a seizure of the person for the prolonged 90-minute period" and did not approve such extended detention based on the facts before it in *United States v. Place*,  462 U.S. 696, 709-710, 103 S.Ct. 2637, 2646, 77 L.Ed.2d 110 (1983). And see *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).


Nevertheless, the Hillmans' arguments focusing  on the length of time they were detained demonstrates that this is not the type of "egregious error" envisioned under this exception noted from  *Riley v. Gray*.  The issues in *Gamble*, *Riley*'s selected comparator case,  did not include a debate over the brevity of the traffic stop and subsequent detention. The faults in the search and seizure were far more fundamental, and concerned a situation where the driver was stopped after being observed backing out of the drive of a residence at the time officers arrived to search those premises, and pretextually using a traffic violation  to ascertain his identity. Afterward, the driver was held without probable cause and his vehicle searched, at which time  the officers uncovered a shotgun in the vehicle. As *Gamble* then elaborated:

> Petitioner's initial detention was purely a subterfuge to force his return to the
> residence. The officers engaged in this artifice in order to simplify the burden of
> proving petitioner's possession and control of any contraband that might be found
> during the search. Once the petitioner was in custody, the officers kept him
> constantly under the barrel of a .12 gauge shotgun, even though petitioner had
> already been searched for weapons. The Miranda warnings were themselves
> delivered under coercive conditions featuring the presence of the shotgun and the

18

articulation of threats to tear apart the house being searched. In view of such
outrageous misconduct, it is inconceivable that the state courts could have applied
the Brown standard and reached the conclusion they did. We therefore uphold the
district court's decision that federal consideration of petitioner's Fourth
Amendment claim is not barred by Stone.

*Gamble v. State of Okl.*, 583 F.2d at 1165 -1166. [7]

In contrast, the Hillmans were not simply in the wrong place at the wrong time, but were

in the sights of law enforcement officers in anticipation of making a drug bust based on

information supplied by an informant who was found to be reliable by the state courts.  No

officer held a gun to either one of the Hillmans to coerce their cooperation.

However, the Hillmans do contend that there was coercion in consent for the vehicle

search following the traffic stop. Their second set of arguments is based on the principle that the

State had a burden to show the existence of initial uncoerced consent and that this consent

survived any effort to withdraw it. However, there were facts articulated in the state appellate

courts decision to support its conclusion that there was initial consent, and more importantly,

that court found there had been consent for the strip search.  For the Federal District Court to

parse through the evidence based on the Hillmans' arguments that these conclusions were not

---

[7]  In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), Brown was stopped without
probable cause at gunpoint by Chicago police officers outside his apartment, the officers then broke into his apartment,
searched it, and arrested Brown for the purpose of questioning him as part of a murder investigation, as an acquaintance
of the victim.  Brown was taken to an interrogation room, read his *Miranda* warnings, and questioned. He confessed to
involvement in the murder and was later convicted  for that murder.  *Wong Sun's* exclusionary rule was extended to
Brown's confession: " Frequently, as here, rights under the two Amendments [Fourth and Fifth] may appear to coalesce
since 'the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the
purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth
Amendment." *Brown* , 422 U.S. at 601, 95 S.Ct. at 2260.

19

factually supported would go even beyond the determination envisioned in *Gamble v. State of Oklahoma,* to ascertain whether the correct Fourth Amendment constitutional standards were applied. See *id.*, 583 F.2d at 1165. The limited scope of Federal review of Fourth Amendment claims does not extend to mere disagreements over the state courts findings, and the Hillmans have come nowhere close to demonstrating a viable argument under the correct standard "egregious error" in the application of Fourth Amendment principles of a magnitude and nature similar to the state court error present in *Gamble*. See *Riley*, 674 F.2d at 526. Consequently, the Hillmans have not demonstrated an "egregious error" to support their manifest injustice arguments, and much more to the point, they have failed to demonstrate a failure of the state court mechanism that would have resulted in a denial of a "full and fair" opportunity to present their Fourth Amendment arguments. Both their grounds which assert only Fourth Amendment claims, must be dismissed.

### *CONCLUSION AND RECOMMENDATION*

Federal review of this petition is constrained to review under 28 U.S.C. §2254(a) for "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody violation of the Constitution of laws or treaties of the United States." Neither of the Hillmans' two grounds, which raise Fourth Amendment claims, present a challenge to their "custody." Accordingly, the pivotal issues from 28 U.S.C. §2254(d) of whether the Hillmans have demonstrated that they are "person[s] in custody" pursuant to a judgment of the state court which resulted in a decision that was contrary to or involved an unreasonable application of Federal law as determined by the Supreme Court of the United States, or was the result of a

20

decision based on an unreasonable interpretation of the facts in light of the evidence in the State

court proceeding, have no application here. (See 28 U.S.C. §2254(d)(1) and (2)). Consequently,

Respondent Margaret Beightler's motion to dismiss should be granted because: the State of Ohio

has provided a procedural mechanism in the abstract through which petitioner could raise a

Fourth Amendment claim; and petitioner's presentation of the claim was not  in fact frustrated

because of a failure of that mechanism. See *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49

L.Ed.2d 1067 (1976).   There has been no demonstrated need for an evidentiary hearing, and it is

therefore recommended that this application for habeas corpus be denied and Respondent's

motion to dismiss be granted. (See ECF # 1, 6).




s/James S. Gallas
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court
within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified
time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v.
Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).